**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Adam David Chase,<br><br>                            Debtor | Chapter 7<br>Case No. 23-10093 |
| Adam David Chase,<br><br>                            Plaintiff<br>   v.<br><br>U.S. Department of Education<br>& Education Credit Management<br>Corporation,<br><br>                            Defendants | Adv. Proc. No. 23-1005 |

**MEMORANDUM OF DECISION**

Citing 11 U.S.C. § 523(a)(8), Adam David Chase sought a determination that excepting his student loans from discharge would impose an undue hardship on him. The evidence adduced at trial was insufficient to meet Chase's burden of proof. For that reason, a judgment on his complaint will enter in favor of the defendant, Education Credit Management Corporation.

**I.    Procedural History**

Chase filed a chapter 7 petition in 2023, and then received a discharge a few months later. In the meantime, he commenced this adversary proceeding. After ECMC was substituted as the real party in interest and two other parties were removed, ECMC and the U.S. Department of Education remained as defendants. [Dkt. No. 15]. With the consent of the DOE, the Court determined that excepting the debt to DOE from Chase's chapter 7 discharge would impose an

undue hardship on him. [Dkt. No. 25]. The court conducted a trial on Chase's complaint against ECMC in September 2024.

## II.    Findings of Fact

The record in this proceeding consists of: (a) the stipulations in the parties' joint pretrial memorandum [Dkt. No. 36]; (b) an oral stipulation read into the record at trial; (c) the exhibits admitted at trial; and (d) the testimony of Chase and one other witness at trial. The following findings of fact are derived from that record.

Chase is 46 years old and has two post-secondary degrees. The original principal balance of all of his student loans was $142,572. When he filed this proceeding, the principal and accrued interest totaled roughly $200,000. The balance previously owed to DOE was approximately $120,000. Now, only the ECMC student loan debt remains. As of June 5, 2024, the total amount of the four debts owed to ECMC was nearly $80,000, broken down as follows: (1) $40,671.75; (2) $1,800.45; (3) $13,503.42; and (4) $23,432.36. The largest loan carries an interest rate of $4.75%, while the others accrue interest at 6.8%.

Chase graduated from college with a degree in economics in 2006. He went to law school at the University of Maine School of Law in 2008 and graduated three years later. During law school, he had two unpaid internships, including one with the Maine District Court. Chase passed the bar exam in the summer of 2012. Before he obtained his license, Chase performed legal research on a contract basis for a firm in Brunswick, Maine. In January 2013, Chase was admitted to practice law in Maine. At some point that same year, Chase applied to work as a paralegal. He also obtained his certification to receive court-appointed cases through the Maine Commission on Indigent Legal Services. At that time, the rate for court-appointed work was $50 per hour. In February 2013, Chase created a partnership with another lawyer in Brunswick.

They parted ways five months later after representing only a handful of clients. Chase then practiced law on his own in Auburn, Maine. This experience was extremely stressful and demanding for him. At some point in 2014 or 2015, Chase decided to stop pursuing the practice of law. He found the work too stressful, and he was not making enough money. Over the course of his two years in practice, his "after-tax" income was approximately $10,000.[1]

In 2015, Chase moved to New York City to live near his brother, who was a producer in the fashion industry. Chase began working in that industry too, designing sets and later working as a project manager for a company that participated in New York Fashion Week. He lived in New York from 2015 to 2020. During that six-year period, he reports that his average annual "after-tax" income was $50,000. In one year, he made $92,000; another year, he made $77,000.

Chase returned to Maine in March 2020. He currently lives in the small town of West Forks, and he intends to stay there for the long term. He has a community of many friends in the area and enjoys the recreational opportunities available to him there.

Since Chase moved back to Maine, he has been working as a carpenter, remodeling houses, and building them from scratch. Over the last four years in this line of work, his average annual "after-tax" income has been about $20,000 per year. In 2023, Chase reported gross receipts of $28,820 on Schedule C to his federal income tax return and deducted business expenses of $8,263, leaving him a net profit of $20,557. In 2022, he reported gross receipts of $23,585 and deducted business expenses of $9,818, leaving him a net profit of $13,767. And, in 2021, Chase reported gross receipts of $37,234 and deducted business expenses of $12,200,

---

[1] When Chase described his income at trial, he clarified that the figures represented his disposable "after-tax" income.

leaving him a net profit of $25,034. From 2021-2023, this net profit was the only income reported on Chase's federal income tax returns.

Chase has worked as a carpenter off and on since he graduated from high school. During college and law school, he worked in the construction industry part-time. In recent years, Chase has generally contracted with homeowners directly and tackled projects with clients who want to be involved in building themselves. Chase charges $35 per hour for his time, and his clients buy the materials directly. Because he often works outside, Chase works more in the summer and less in the winter. He currently has six to twelve months of work lined up. Chase has no difficulty finding work where he lives. He does not advertise his services.

In his chapter 7 case, Chase listed very few assets. He drives an older vehicle and has about $15,000 saved for retirement. He filed his chapter 7 petition hoping to discharge his student loans; he has no other debt. His schedules reveal that, as of the petition date, he had monthly income from operating a business of about $1,500. However, he reports that his monthly income averaged over 2021, 2022, and 2023 was closer to $1,650. Chase pays a longtime friend $800 per month to rent a loft-style apartment on the banks of the Dead River. He has looked for other housing and found there are not many other rental properties in the area. His other expenses are relatively modest. He receives assistance from his parents in the amount of $350-$600 per month, leaving him with no monthly net income.[2] He has no dependents.

Chase is a competent outdoorsman, but he has not sought employment in that industry because he believes that the work would not be lucrative. He has never sought employment in

---

[2] At trial, Chase offered an income and expense analysis that he created, as Plaintiff's Exhibit 4A. ECMC objected to part of the exhibit, and the Court took that objection under advisement. Although the objection was vague, in context, it is best understood as an objection under Fed. R. Evid. 901(a). The objection is hereby overruled: there was sufficient evidence in the record from which the Court could find that the parts of Exhibit 4A that ECMC objected to were what Chase claimed they were.

the economics field.  Chase has never looked for legal work outside of Maine, and he has not looked for work in that field since he returned to Maine.  He has never applied to work as a legal assistant or a title researcher.  Chase is not currently licensed to practice law and has not been for ten years.  To renew his license, he would need to take CLE courses and pay licensing dues.  Chase finds that prospect daunting and is uncertain he would be marketable.  He has contemplated returning to practice to take court-appointed criminal cases in light of the well-publicized backlog of those cases in the state courts.  But he is not sure that he has the qualifications and the temperament for the work.[3]

At this point, carpentry is Chase's chosen profession.  He enjoys it, and it is work that is available to him where he currently lives.  He is fond of his community and the natural beauty in West Forks.  He does not want to move out of state or live in Portland and does not think that should be expected of him.  He understands that he could earn more if he lived elsewhere but believes that relocation would also come with higher living expenses.

Since he graduated from law school, Chase has paid a total of $43,947 on all of his student loans (including the loans previously held by DOE and the loans now held by ECMC).  He has been granted forbearances or deferments on several occasions and believes that he has taken advantage of income-driven repayment ("IDR") options.  He made no payments on his loans from 2011 through 2017, made a single payment of more than $26,000 in 2018, and then paid about $15,000 on the loans over the course of 2022 and the first several months of 2023.  As for the $26,000 payment, Chase prioritized paying off a particular loan because his father

---

[3] When asked at trial, Chase indicated that he was not aware that the State of Maine has raised the rate for court-appointed criminal defense work to $150 per hour.  This lack of awareness suggests that he has not seriously considered pursuing a career focused on indigent criminal defense.

cosigned it. While working in New York, he sent payments to his mother, who saved them up and combined them with the proceeds of an inheritance to make that lump-sum payment.

Chase has several options for repaying the ECMC student loans. Under a graduated plan, payments would start lower and phase higher, with an initial payment of $450 per month and a payment of $787 per month at the end of the repayment term. Under a standard plan, Chase would pay $518 per month. Chase could also apply to participate in an IDR plan. He believes that if he did so, his monthly payments would be minimal or even $0. However, he understands that interest would continue to accrue and capitalize under an IDR plan. At the end of the repayment term, he understands that the loans could be forgiven, but believes that he would then owe tax on account of discharge-of-indebtedness ("DOI") income. He is concerned that if he participates in an IDR plan, he will never be able to obtain any other credit within his lifetime.

### III. Conclusions of Law

A chapter 7 discharge does not discharge a student loan debt described in 11 U.S.C. § 523(a)(8) "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents[.]" Id. The parties have stipulated that the loans held by ECMC are the types of debts that fall within § 523(a)(8). [Dkt. No. 36, ¶ F]. To obtain a discharge of those debts, Chase bore the burden of proving, by a preponderance of the evidence, that excepting the loans from discharge would impose an undue hardship on him. Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 797 (B.A.P. 1st Cir. 2010). He did not meet that burden.

In a pretrial filing, Chase flagged the guidance issued by the Department of Justice in November 2022 to assist DOJ attorneys in evaluating whether excepting student loans owed to DOE would impose an undue hardship on a debtor and the debtor's dependents. See [Dkt. No.

41] (citing Guidance for Department Attorneys Regarding Student Loan Bankruptcy Litigation Nov. 17, 2022, *available at* https://www.justice.gov/ust/student-loan-guidance). Chase urged the Court to adopt that guidance in evaluating undue hardship in this proceeding. However, as set forth in the DOJ memorandum, the guidance is "an internal" DOJ policy that is "not intended to and does not create any rights, substantive or procedural, enforceable at law by any party in any matter." Guidance 16 n.22. The standards set forth in the DOJ memo are not binding on this Court, or any other court. *See* Longo v. Discover Bank (In re Longo), No. 21-20909 (JJT), 2023 WL 1481591, at *3 n.3 (Bankr. D. Conn. Feb. 2, 2023). The undue hardship analysis is informed by the text of the statute and caselaw interpreting the statute.

The Bankruptcy Code does not define the phrase "undue hardship." In the absence of a statutory definition, courts often look to dictionaries to reveal the meaning of statutory text. *See, e.g.*, Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 399 (4th Cir. 2005) (looking to dictionary to discern meaning of "undue"). In ordinary parlance, "undue" means (among other things) "unwarranted." *See* Webster's Third New International Dictionary 2492 (Philip Babcock Gove, ed., 1993). The First Circuit Court of Appeals has described the burden of establishing undue hardship as a "formidable task[.]" Nash v. Conn. Student Loan Found. (In re Nash), 446 F.3d 188, 191 (1st Cir. 2006). In doing so, the Court has observed that § 523(a)(8) reflects a legislative determination that the "continued viability" of federal student loan programs is an interest that takes precedence over the general "fresh start" purpose of the Bankruptcy Code. Id. (citing TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 937 (1st Cir. 1995)).

Courts have developed several tests for assaying undue hardship. *See* id. A majority of the circuit courts of appeal have adopted the test set forth in Brunner v. New York State Higher Educational Services Corporation, 831 F.2d 395 (2d Cir. 1987). *See* In re Nash, 446 F.3d at 190

(indicating that nine of the circuits employ this approach). Under the Brunner test, to establish undue hardship a debtor must show: (1) an inability to maintain a minimal standard of living based on current income and expenses; (2) a "likelihood that this inability will persist for a significant portion of the repayment period"; and (3) that he has made good faith efforts to repay the loans. Id. (describing the test set forth in Brunner). The First Circuit has not adopted Brunner, or the competing totality-of-the-circumstances test set forth in Long v. Educational Credit Management Corporation (In re Long), 322 F.3d 549 (8th Cir. 2003). *See* In re Nash, 446 F.3d at 190; *see also* Brown v. Educ. Credit Mgmt. Corp. (In re Brown), No. 18-1012, 2019 WL 13215723, at *1 (1st Cir. Mar. 13, 2019) (assuming without deciding that the totality test applied). However, many bankruptcy courts within the First Circuit evaluate undue hardship under the totality test. *See* Brown v. Educ. Credit Mgmt. Corp. (In re Brown), 581 B.R. 695, 669 & n.1 (D. Me. 2017); In re Bronsdon, 435 B.R. at 797-98 & nn.10-11; Kopf v. U.S. Dep't of Educ. (In re Kopf), 245 B.R. 731, 741 (Bankr. D. Me. 2000). The totality test is what it sounds like: it requires courts to consider all relevant facts and circumstances, including "the debtor's past, present, and reasonably reliable future financial resources" and the reasonably necessary living expenses of the debtor and any dependents. In re Long, 322 F.3d at 554.

The second prong of the Brunner test requires proof of "exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time" – proof that the hardship of the debtor's present circumstances is likely to persist, and that it is "undue." Brunner, 831 F.2d at 396. The totality test features a similar forward-looking component. As articulated by the Bankruptcy Appellate Panel in Bronsdon, the totality analysis requires a debtor to establish that he cannot repay his student loans while maintaining a minimal standard of living, considering his past, present, and *future* financial resources, his reasonably necessary

Case 23-01005    Doc 45    Filed 12/12/24    Entered 12/12/24 14:07:33    Desc Main
Document    Page 9 of 15

living expenses, and other relevant circumstances unique to the case. In re Bronsdon, 435 B.R. at 798. This similarity makes sense; the undue hardship analysis is necessarily forward-looking. Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 27 (Bankr. D. Mass. 2005). There is a further similarity between Brunner and the totality test: "courts applying either test do not consider the debtor's current income and expenses unchangeable; instead, courts focus on whether the debtor has maximized his or her income potential and has minimized expenses to include only reasonably necessary expenses." Id. at 26 (quotation marks omitted). Given these similarities, there is no need to pick a lane in this case. The result, under either test, would be the same – denial of Chase's efforts to discharge the ECMC student loans.

Chase did not establish that his present inability to maintain a minimal standard of living while repaying the loans is a hardship that can be fairly characterized as "undue." This conclusion has nothing to do with his expenses. ECMC criticized only one of Chase's expenses – the $800 per month for an apartment. In the absence of evidence that other rental units are available for less, $800 per month is not unreasonable. As noted previously, Chase's expenses, including his rental expense, are relatively modest. The outcome here turns on the income side of the equation and Chase's efforts – or lack of efforts – to maximize his income.

Chase did not establish that he has made, or that he is willing to make, reasonable efforts to maximize his earning potential. He has decades of experience in the construction industry. He also has a law school degree and the skills required to take on relatively lucrative work in the fashion industry. Completing law school and passing the bar exam is no small feat; that was an accomplishment that required sustained effort on Chase's part. When he lived in New York, Chase earned much more than he is currently earning. Based on his education and employment history, the Court infers that Chase is capable of working hard and capable of earning more than

- 9 -

he does now.  If he were willing to leave the small town of West Forks to look for work, there would be more opportunities for him to find higher paying employment.  He concedes as much, but he is not willing to relocate.

Chase did not sufficiently explain why he was not able to obtain remunerative employment after graduating from law school, passing the bar exam, and gaining admission to practice in Maine.  *Compare* Educ. Credit Mgmt. Corp. v. Kelly (In re Kelly), 312 B.R. 200 (B.A.P. 1st Cir. 2004) (affirming order discharging student loans incurred to finance law school education where 41-year-old debtor failed the bar exam five times and worked three part-time jobs at the time of trial, including as a school bus driver, to support herself and her three dependents), *with* Joyce v. Mountain Peaks Fin. Servs., Inc. (In re Joyce), 342 B.R. 385 (B.A.P. 1st Cir. 2005) (affirming judgment deeming student loans nondischargeable where debtor, a 38-year-old graduate of medical school with no dependents, worked part-time for Verizon and in a flower shop, following his decision not to complete a five-year residency program in pathology).

Chase did not say why his partnership in Brunswick failed.  He did not explain what efforts, if any, he made to find another partner or to obtain employment as a lawyer at a firm.  He testified that he "applied for many jobs through the state" around 10 years ago but did not identify the positions to which he applied.  It is also unclear why Chase was unable to operate a more successful practice as a solo practitioner.  He did not offer evidence that he engaged in networking or advertised his services.  Although he testified that he was certified to take court-appointed cases, he did not say how many or what type of cases he was assigned.  He also did not say whether he made any efforts to hire staff or to obtain any mentoring or other support that might have rendered his practice more profitable and better equipped him to manage the stress of

practice.[4]  In short, the evidence about Chase's efforts to obtain employment in the legal field was scant, and his decision to stop practicing law was not adequately explained.

The same is true of his decision to leave his relatively lucrative employment in the fashion industry in New York City.  Chase testified that he could afford to make payments on his student loans while he lived in New York, and that he made the bulk of his payments on the loans using funds earned during those years.  Chase protested that the cost of living was higher there, and that rings true.  Even so, he conceded that if he lived in New York, he could theoretically repay all of his student loans.  Why Chase left New York is not clear.  What is clear is that he does not want to move back, or to return to his work in the fashion industry, where he was able to earn much more than he earns now.

Setting aside his qualifications to pursue employment outside of the construction industry, Chase did not show that he has made, is making, or is even willing to make reasonable efforts to maximize his income in that industry.  Chase testified that he works an average of 30 to 32 hours per week over the course of a year – more in the summer and less in the winter.  At one point, Chase also testified that his employment is "somewhat seasonal" and that he works only ten months out of the year.  He did not explain why he is unable to secure at least some work indoors during the winter months.  But taking his testimony that he (a) works only ten months of the year and (b) charges $35 per hour at face value, the gross receipts reported on his federal tax returns suggest that he is not, in fact, working 30 to 32 hours per week during the months that he

---

[4] The demanding nature of legal practice cannot have come as a complete surprise to Chase.  Lawyering is a relatively stressful occupation.  But "the types of stress lawyers encounter tend to vary depending on areas of practice." Pamela Bucy Pierson et al., Stress Hardiness & Lawyers, 42 J. Legal Prof. 1, 37 (2017).  There are also behaviors and strategies that "stress hardy" lawyers can learn to manage stress. Id. at 21 & 40-63.  Because the stress of practice was something that could and should have been anticipated and possibly ameliorated, it cannot, standing alone, move the needle in the undue hardship analysis.

is working. That conclusion practically jumps off the page:

| Tax Year | Gross Receipts | Hours Worked Per Year | Average Hours Worked Per Month | Average Hours Worked Per Week |
|---|---|---|---|---|
| 2023 | $28,820 | 823.4 | 82.3 | 19.1 |
| 2022 | $23,585 | 673.9 | 67.4 | 15.7 |
| 2021 | $37,234 | 1,063.8 | 106.4 | 24.7 |

These calculations are imprecise. They do not account for any uncollectible receivables or any receivables that Chase may have had outstanding at year-end. But even with such imprecision, it appears that, in recent years, Chase has not been fully employed.

Chase's approach to making money was summed up in the following exchange: when asked whether he was motivated by money, Chase replied "to a certain extent, but generally no." The picture that emerged at trial was a picture of a person with the skills and qualifications to engage in multiple lines of work who has avoided remunerative work in the past – and desires to continue to do so going forward – to avoid the stress of urban living and to avoid the stress and responsibility of working full-time.

There is no compelling evidence that Chase is not able to work full time. He mentioned that he had broken his leg several years ago, and that he has had at least one unrelated surgery in the past. But there is no suggestion that he suffers from any chronic or ongoing health conditions that negatively impact his ability to work. *Cf.* Erkson v. U.S. Dep't of Educ. (In re Erkson), 582 B.R. 452, 555 (Bankr. D. Me. 2018) ("Plaintiff suffers from a condition that negatively impacts her capacity for earning and . . . this condition is unlikely to be remedied in sufficient time to afford her a meaningful period of time during which to generate sufficient income to maintain a minimal standard of living while making payments on her student loans."). Beyond that, Chase is only 46 years old. He has many working years ahead of him, during which he could improve his standard of living and make efforts to repay his student loans. *Cf.* id. at 552 (discharging

student loans held by 67-year-old with hearing impairment based in part on determination that it was "unlikely" she had "sufficient working years remaining to substantially improve her financial condition for a sustained period of time"); Ackley v. Sallie Mae Student Loans (In re Ackley), 463 B.R. 146, 150 (Bankr. D. Me. 2011) (discharging student loans held by spouses, who were 58 and 60 years old where their "personally described and objectively observable ailments [would] persist into the future and affect adversely their employability beyond retirement age").

At trial, there was some suggestion that Chase would be eligible to participate in some form of IDR plan. He believes that he did so previously and testified that he "might" be willing to do so again. He also believes that if he applied for such a plan today, his monthly payments would be minimal or even $0. However, Chase is concerned that if he were to participate in such a plan, the balance would grow due to negative amortization, and at the end of the repayment period the loan would "theoretically be forgiven" but he would owe tax on DOI income – perhaps only on the original principal balance, but perhaps on accrued interest as well. Chase is also concerned that if he participates in IDR, he will never be able to obtain any other credit within his lifetime. Aside from these generalized beliefs and concerns, Chase did not present any concrete evidence of which IDR plan(s) he would be eligible for, how much his monthly payments would be under such plan(s), the term of repayment under any such plan(s), the projected tax consequences of loan forgiveness decades from now, or a negative impact on future creditworthiness. On this record, there is no need to write chapter and verse about the relationship between IDR plans and the undue hardship standard of § 523(a)(8), a relationship that is thorny at best. Chase did not establish that participation in an IDR program would, necessarily, prevent him from obtaining any other credit. He did not offer any evidence that he

had actually applied for, and been denied, credit due to his outstanding student loans.  Many variables factor into a decision to extend, or deny, credit.  Yes, existing debt certainly factors in, but so does the applicant's income, a subject much discussed elsewhere in this decision.  Chase also failed to establish that if he participates in an IDR plan, he will owe tax on account of DOI income.  The amount of any such tax would depend on a number of variables, including the tax law in effect on the date of loan forgiveness (and under current tax law whether Chase is solvent on the date of loan forgiveness).  At this point, and on this record, the tax bill is only a hypothetical; it is not the stuff of undue hardship.  *Cf.* Carney v. Educ. Credit Mgmt. Corp. (In re Carney), No. 20-40723-CJP, 2023 WL 2576174, at *1 (Bankr. D. Mass. Mar. 20, 2023) (concluding that debtor had not met her burden of demonstrating "that she will suffer adverse tax consequences many years from now").

      Chase conceded that he would be able to repay at least some of his student loans.  He testified that he would be able to make payments of $250 per month, and that it would be "manageable" to repay about $40,000 of the $80,000 balance on the ECMC loans.  It is unclear where Chase would find the money to make those payments.  The evidence shows that his expenses exceed his income, and that he relies on his parents to pay for the expenses that fall in the delta.  Chase's concession that he could repay some of the outstanding loans could be construed as an acknowledgement that he is capable of earning more than he is currently earning.  Or, perhaps, Chase's "after-tax income" does not include all of his income; perhaps he is not reporting all of his earnings as taxable income.  Whatever the explanation, it is hard to reconcile Chase's concession that he could afford to repay roughly half of his outstanding balance with the evidence concerning his current income and expenses.  In light of that concession, in light of the DOE's agreement to include the student loans owed to it in the debtor's chapter 7 discharge, and

on the record as a whole, the Court cannot conclude that excepting any of the debts owed to ECMC would impose an unwarranted hardship on Chase.

Any hardship imposed on Chase by excepting the ECMC student loans from his discharge appears to be a consequence of his choice to live in a remote area and to pursue work available to him there that he enjoys. In that respect, this case is similar to Brown v. Northstar Education Finance, Inc. (In re Brown), No. 15-20067, 2017 WL 745590 (Bankr. D. Me. Feb. 24, 2017), where the court denied the debtor's efforts to discharge her student loans based, in part, on a determination that her "most significant obstacle to gainful employment was . . . her unrealistic expectations that reasonable employment must be flexible, comfortable, enjoyable, and lucrative." Id. at *5. Chase's preference for rural living and desire to live in a community of friends near natural resources he enjoys and to engage in work he likes are all understandable. But he cannot have all of that and enjoy the benefit of a discharge of the ECMC student loans under § 523(a)(8), too.

Dated: December 12, 2024

                                               Michael A. Fagone
                                               United States Bankruptcy Judge
                                               District of Maine